## American National Bank v. Minor & Son.

(Decided March 16, 1911.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Third Division).

1. Banks and Banking—Notes Pledged as Collateral.—Every presumption is in favor of the validity of notes pledged as collateral for the payment of a debt due a bank.

2. Same—Rights of Parties—Absence of Fraud.—There being neither fraud nor mistake shown in the transaction and a bank's rights being measured by the information it had at the time certain notes were pledged it as collateral, the contract must be enforced as written for the bank's right to make such a contract can not be seriously questioned.

3. Applying Proceeds of Collaterals.—The consideration being sufficient a bank can not be denied its right to apply the proceeds of notes filed with it as collateral, unless it is shown that it did not become the holder thereof in due course.

4. Bank's Interest in Pledged Collaterals.—The status of a bank's claim to an interest in notes filed with it as collateral is fixed and determined by the information which it had concerning said notes at the time they were pledged to it, and it can not be prejudiced by acts of other parties of which it had no knowledge. Possession of a note is prima facie presumption of ownership.

HENRY BURNETT for appellant.

J. L. RICHARDSON and H. O WILLIAMS for appellees.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

On October 17, 1908, R. J. Finck was indebted to the American National Bank upon two notes which were.

past due. The aggregate amount of these notes on said date was $2,759.43. In order to secure further time within which to pay same, the maker agreed to pledge, as additional security, two notes executed by E. H. Taylor, Jr. & Sons, and payable to J. S. Minor & Son, and endorsed by them to Finck. This proposition was acceptable to the bank, and on said date a collateral note was signed by Finck for the amount of said debts, and the two notes above referred to were pledged with the bank. These Taylor notes, upon maturity, were collected by the bank, and the proceeds thereof applied, first, to the discharge of the obligation of October 17, 1908, and the balance of $692.05 was applied to the discharge in part of another note held by the bank against Finck and one Conner for $3,400. The authority for making this application of the $692.05 is found in the following provision of the collateral note: "Having deposited with the said bank as collateral security for payment of this or any other liability or liabilities of mine to said bank, due or to become due, or that may hereafter be contracted, the following property." (Here follows a description of the notes.)

It developed that Minor & Son had merely loaned the notes in question to Finck as a matter of accommodation to enable him to secure the desired extension on the payment of his $2,759.43 indebtedness, and before the Taylor notes matured Mr. Minor called at the bank and had a conversation with the president relative to this overplus, and, while there is some difference in their testimony as to exactly what was said, it is certain that at that time the bank was advised that the notes were the property of Minor & Son and had been loaned to Finck as an accommodation, and that they were looking to the bank for the surplus after the $2,759.43 had been paid. Upon advice, the bank refused to pay this overplus to Minor & Son, but appropriated it as above indicated. Hence this law suit. The trial in the lower court resulted in a verdict and judgment in favor of Minor & Son, and the bank appeals.

Plaintiffs bottomed their case upon the charge that, through fraud or mistake, the collateral note for $2,759.43 had been signed by Finck. They pleaded, that while the note stated that the Taylor notes pledged as collateral should be held as security for any other liability of Finck's to the bank, he did not so understand the

transaction, and by the evidence plaintiffs sought to establish this fact. Two witnesses, the president and the bill clerk of the bank, testified, that the most favorable construction which can be put upon their testimony for plaintiffs is that nothing whatever was said about any other debt of the bank against Finck, and, in particular, nothing was said about the Conner debt at the time the collateral note was signed. These bank officials knew that it was one of the requirements of the bank that collateral pledged to it should be liable for any other indebtedness owing to it by the one pledging the collateral. The president was certainly not mistaken as to the rights he intended to secure to the bank in this matter, and his failure to discuss or mention other debts is no evidence at all that he intended the bank to accept this collateral as security for the one debt alone. On the other hand, his failure to discuss this feature of the transaction would rather tend to show that he understood that this collateral was being accepted in the usual and customary way in which collateral was pledged to the bank. If it had not been the custom of the bank in accepting collateral to hold it for all indebtedness due it from the one pledging it, there might be some force in the argument that, as no other debt was mentioned none other was intended to be covered by this collateral. But when it is remembered that the note executed was on the printed form in general use in the bank, the failure of the president or clerk to discuss this feature of the transaction at length cannot be accepted as evidencing either fraud or mistake on the part of the bank. The note was such as was used by all customers who borrowed money from the bank upon collateral security. Finck proposed to get his accommodation from the bank by executing a collateral note and pledging the Taylor notes on it. There is nothing in the record to show that he did not thoroughly understand the terms and conditions imposed by the note, and his failure to read it, if he did fail to read it, or discuss its provisions cannot be accepted as evidence that he was in anywise deceived or mistaken as to its terms and conditions. He was an active business man, conducting a business that evidently required the use of considerable money. It is shown that he had dealings with other banks as a borrower of money. All of this tends to show that he knew and understood what he was doing, and that in signing this note he was neither

overreached nor mistaken. Every presumption is in favor of the validity and legality of the paper, and, plaintiffs having assumed the burden of showing that in its execution the said Finck was deceived or mistaken, it devolved upon them to show this fact, either by direct evidence or by the exposition of such facts and circumstances connected with its execution as would warrant and justify the conclusion that a fraud was practiced upon him or that a mistake had been made. No direct evidence tending to establish either of these facts was produced, and the circumstances attending its execution are not such as would reasonably support either charge. On the contrary, they could with as much propriety be said to establish the converse of these propositions. Upon this state of case we must conclude that, as between the bank and Finck, there was neither fraud nor mistake in the execution of the collateral note.

J. S. Minor, of Minor & Son, testified that they owned these notes pledged as collateral, and that they were loaned to Finck with the distinct understanding that they were to be pledged as security for the $2,759.43 debt alone. Finck was dead, and this testimony was in favor of plaintiffs, and tended to establish their claim to the money in dispute in this litigation. The bank objected to it as violative of Section 606, sub-section 2 of the Code, but the court overruled the objection and permitted the evidence to go to the jury. So much of this section of the Code as is pertinent provides that "no person shall testify for himself concerning any verbal statement of or transaction with one who is dead when the testimony is offered to be given." All of this testimony objected to was concerning a conversation that took place between Minor & Son and Finck at the time the notes were loaned to him and endorsed by them so that he could use them in securing credit. The bank knew nothing of this conversation or arrangement between them and could in no wise be bound by it, even if the purposes for which the Taylor notes were loaned were limited by plaintiffs, unless knowledge of this fact was brought home to the bank at or before the date upon which the notes were pledged to it. The status of the bank's claim to and interest in this collateral is fixed and determined by the information which the bank had concerning said collateral notes at the time they were pledged to it. Plaintiffs had endorsed them and delivered them to Finck, and if he

exceeded the verbal authority given him by them, the bank cannot be prejudiced because thereof in the absence of any knowledge of plaintiffs' interest in said notes or the limited use to which plaintiffs intended them to be applied. In the form in which they were presented to the bank it had a right to presume that they were the property of Finck. Possession was presumptive ownership, and plaintiffs, having clothed him with the right to use them are in no position to complain because he broke faith with them and pledged the notes in a way and manner so as to consume and take up the full value thereof, any more than they would be in a position to complain had he sold and discounted the notes to the bank and taken the proceeds and appropriated them to his own use. In either event, it would be a question between Finck and plaintiffs, and not plaintiffs and the bank. It may be true, that Finck broke faith with plaintiffs and failed to use their paper as they expected him to, that he did not protect their interest in discounting these notes to the bank, and that he did not disclose to the bank their ownership; but for this he alone is answerable to them, and if they have sustained a loss because of this breach of faith, plaintiff, and not the bank, must suffer. All of this evidence as to the conversation between plaintiffs and Finck, and the instructions given him by them as to the use which he might make of the Taylor notes, tended to establish plaintiffs' claim—was directly in plaintiffs' interest—and under the section of the Code quoted should have been excluded.

There being neither fraud nor mistake shown in the transaction, and plaintiffs' right being measured by the information it had at the time the Taylor notes were pledged to it, the contract must be enforced as written, for the bank's right to make such a contract cannot be seriously questioned. In 1 Morse on Banks and Banking, 4th Ed., section 332, it is said:

"General liens are not favored, and must rest upon special agreement, course of dealing between the parties, or general usage.

"And if there is any circumstance inconsistent with the claim of a lien, it will not be upheld, as where securities are delivered to a bank for a specific purpose."

Accepting this as a correct exposition of the law, and measuring plaintiffs' rights thereunder, it seems its con-

tentions must be upheld, for the note expressly authorizes its application to any other indebtedness of Finck to the bank. In other words, the bank's right to make this application arises out of the contract, which stands un-impeached.

The case of the Hanover National Bank v. Suddath, 215 U. S., 110, cited and relied upon by appellee, is not in conflict with this view, but rather supports it. In that case there was an attempt on the part of the Hanover bank to hold and apply certain notes to the payment of an indebtedness which it held against the Abilene bank when these notes were offered for discount. They were not pledged at all but were offered for sale, as it were, and the court simply held, that when they were offered to it for one purpose they could not be held for another over the protest of the owner. There was no such agreement in that case as here, but the right of the Hanover bank to make the application sought was denied for the very reason that, instead of an agreement authorizing such an application, there was a positive instruction to the contrary.

It is urged that there was no consideration for the agreement to pledge the collateral to secure other debts. Section 25 of the Negotiable Instruments Code provides that:

"Value is any consideration sufficient to support a simple contract. An antecedent or pre-existing debt constitutes a value, which is deemed such, whether the instrument is payable on demand or at a future time."

And section 27 of said act further provides that:

"Where the holder has a lien on the instrument, arising either from contract or by implication of law, he is deemed a holder for value to the extent of his lien."

The agreement not to sue, but to extend the time for the payment of the debt then due, to-wit, $2,759.43, is ample consideration for the pledge of the notes in the way and manner provided in the contract.

The consideration being sufficient, the bank cannot be denied its right to apply the proceeds of the Taylor notes as the contract provides, unless it is shown that it did not become a holder in due course. Section 52, subsection 4, of the Negotiable Instruments Code provides that, to constitute one a holder in due course, it must appear:

"That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

No notice was brought home to the bank of plaintiffs' claim or ownership until long after it had accepted these notes as collateral and its interest had attached.

Upon this showing we conclude that the bank had a perfect right to make the application of the proceeds of the Taylor notes in the way and manner in which it did, and the motion for a peremptory instruction should have been sustained. Judgment reversed and cause remanded for further proceedings consistent herewith.